THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FEDERAL TRADE COMMISSION          *

            Plaintiff              *

            vs.                    *    CIVIL ACTION NO. MJG-11-1483

LOMA INTERNATIONAL                 *
BUSINESS GROUP INC., et al.
                                   *
            Defendants
*       *       *       *       *       *       *       *       *

<u>MEMORANDUM OF DECISION</u>

The Court has conducted a bench trial of Plaintiff's claims

against Defendants Manuel Alban ("Mr. Alban") and Lola Alban

("Mrs. Alban") (collectively "the Albans"), ("Loma") and

Servicios LatinoAmericanos De Maryland, Inc. ("Servicios").[1]  The

Court has heard the evidence presented, reviewed the exhibits,

considered the materials submitted by the parties, and had the

benefit of the arguments of counsel.  The Court now issues this

Memorandum of Decision as its findings of fact and conclusions

of law in compliance with Rule 52(a) of the Federal Rules of

Civil Procedure.[2]

---

[1]  Defendant Marco Alban, having filed a Motion for Summary
Judgment resolved herewith, did not participate in the trial.
[2]  "In an action tried on the facts without a jury . . . the
court must find the facts specially and state its conclusions of
law separately. The findings and conclusions may be stated on
the record after the close of the evidence or may appear in an
opinion or a memorandum of decision filed by the court. Judgment
must be entered under Rule 58."  Fed. R. Civ. P. 52(a)(1).

The Court finds the facts stated herein based upon its evaluation of the evidence, including the credibility of witnesses, and the inferences that the Court has found reasonable to draw from the evidence.

I.   INTRODUCTION

For some ten years, from 2001 to 2011, Defendants Manuel Alban ("Mr. Alban") and Lola Alban ("Mrs. Alban") (collectively "the Albans"), being neither qualified nor accredited to do so, operated an immigration business serving – or in all too many cases disserving – Spanish-speaking customers.  Furthermore, Mr. Alban, on occasion, engaged in the unauthorized practice – or malpractice – of law.

On June 1, 2011, the United States Federal Trade Commission ("FTC")[3] filed the instant suit alleging that the Defendants knowingly violated Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by expressly and impliedly misrepresenting to consumers that they were authorized immigration service providers, although they were not.

---

[3]  The FTC is an independent agency of the United States government charged with enforcement of the FTC Act, which, under Section 5, prohibits unfair or deceptive acts and practices in commerce.

The FTC seeks to have the Court permanently enjoin the
Defendants from violating § 5(a) of the FTC Act by engaging in
unauthorized immigration services or any similar deceptive
practice and seeks restitution in the amount of $750,000.  As
discussed herein, the Court finds that the FTC has established
the need for injunctive relief against the Albans.  However, the
Court finds it necessary to conduct further proceedings to
resolve remaining issues relating to the equitable relief to be
provided.


II.  <u>STATUTORY FRAMEWORK</u>

Section 5(a) of the Federal Trade Commission Act ("the FTC
Act") states, in pertinent part:

> (a) Declaration of unlawfulness; power to
> prohibit unfair practices; inapplicability
> to foreign trade
>
> > (1) Unfair methods of competition in or
> > affecting commerce, and unfair or
> > deceptive acts or practices in or
> > affecting commerce, are hereby declared
> > unlawful.
> >
> > (2) The Commission is hereby empowered
> > and directed to prevent persons,
> > partnerships, or corporations, [with
> > stated exceptions] from using unfair
> > methods of competition in or affecting
> > commerce and unfair or deceptive acts or
> > practices in or affecting commerce.
>
> . . . .

> (B) All remedies available to the Commission
> with respect to unfair and deceptive acts or
> practices shall be available for acts and
> practices described in this paragraph,
> including restitution to domestic or foreign
> victims.

15 U.S.C. § 45(a) (West 2006).

Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).

III. <u>DISCUSSION</u>

A.   <u>Background</u>

The Albans emigrated to the United States from Ecuador in the mid-1960's and became United States citizens.  Mr. Alban was employed in the plastics industry until his retirement in the mid-1990's, and Mrs. Alban worked for a bank from 1973 until she retired in 2002.

After his retirement, Mr. Alban, together with others in the local Hispanic community, set up a Spanish-speaking radio station.  The business did not succeed.

The Albans, in or about 1993, set up a Spanish-language newspaper called "El Heraldo."  The Albans named the advertising

arm of El Heraldo "Loma, Inc."[4] although the entity was not a
corporation.  The newspaper ceased operations in 2004.

Mr. Alban testified that in or about 2000, he attended an
immigration seminar and was told that he did not need to be an
attorney to assist with filling out immigration forms but that
he needed to apply to the Executive Office for Immigration
Review to be an accredited representative.[5]  M. Alban Dep.
239:21-243:15, Pl.'s Ex. 30.  In early 2001, Mr. Alban became
aware that the pertinent agency of the United States government[6]
provided that citizens of El Salvador and Honduras could apply
for Temporary Protection Status ("TPS") benefits.  Although Mr.
Alban had been informed that he needed formal accreditation to
do so, the Albans then began their immigration service business
discussed herein without obtaining any such accreditation.  The
Albans operated the immigration service business under the name
"Loma, Inc."

---

[4]  The name "Loma" is derived from Mr. & Mrs. Alban's first names
- LO for Lola and MA for Manuel.
[5]  To be properly accredited, an immigration services business
must be operated by a licensed attorney, a law student acting
under the supervision of a licensed attorney, an individual
granted permission to appear on behalf of persons with whom the
individual has a previous relationship and without remuneration,
or a person formerly authorized to practice before USCIS.  8
C.F.R. § 292.1, 1292.1.
[6]  Initially the Department of Immigration and Naturalization
Service ("INS"), which in 2003, officially became the Bureau of
Citizenship and Immigration Services ("BCIS" or "USCIS"),
operating under the Department of Homeland Security ("DHS").

In or about 2002, Mr. Alban attended a tax preparation seminar and obtained authorization to prepare income tax returns. He provided the income tax preparation and filing services under the "Loma, Inc." name.

At about the same time, Mr. Alban began to provide drug and alcohol counseling to members of the Hispanic community.[7] This business was operated under the name "Servicios LatinoAmericanos De Maryland, Inc." although, as with Loma, Inc., the name did not then refer to an existing corporation.

In 2005, Mr. Alban prepared and signed incorporation papers for corporations to be named "Loma International Business Group, Inc."[8] and "Servicios LatinoAmericanos De Maryland, Inc." In 2007, the papers were filed and the corporations were formed. Mr. Alban was identified as the sole director of both corporations. Pl's Ex. 16, 17.

B.   The Immigration Services Operation

The Albans testified that when they first began offering assistance with completing immigration forms, most of their

---

[7]  Regular classes were conducted by certified counselors, and a fee was charged per class.  Mr. Alban took the courses for certification in drug and alcohol abuse counseling.  M. Alban Dep. 15:18-17:4, Pl.'s Ex. 30.
[8]  Apparently, the name "Loma. Inc." was not available.

customers brought in their own forms[9] and they, purportedly, offered only a translation and "secretarial" service.  The Court does not find this testimony credible and, rather, finds that from the beginning, and until the end of their immigration services, Mr. Alban and, to a lesser extent, Mrs. Alban did far more than translate and type what their customers told them to type.

The Albans interviewed customers, decided which forms were needed, and filled in the forms.[10]  The Albans also translated and made copies of required attachments such as birth certificates, photographs, provided a cover letter in English, and often mailed the documentary package to USCIS.[11]  The Albans charged fees for their services as discussed below.

Initially, the Albans had the customers provide their personal checks or postal money orders that were sent to the Government with the immigration forms.  However, in order to be able to verify the Government's receipt of the documents and payments, the Albans changed the process for customers not paying by check.  The Albans obtained the funds from their

---

[9]  Even if this were true as to the very beginning of their operation, the Albans purchased a software system in 2002 or 2003 that enabled them to produce and fill in forms on their computer.
[10]  Usually, with information provided by the customers.
[11]  Renewal applications were much simpler than original applications.  Renewals were either annually or every 18 months.

customers, deposited the funds into a Servicios checking account, and then made payment to the Government by a Servicios check.  The canceled check served as proof of receipt.  The Albans stopped using the Servicios bank account for this purpose in 2007.

The Albans did not operate their immigration business competently.  While some customers fortunately obtained what they sought, many did not.  Data from USCIS shows that of more than 600 immigration applications capable of association with Defendants, over 60 percent were denied or rejected. Strong Decl. 2 ¶ 6, Pl.'s Ex. 9.

Some customers suffered severely for their reliance upon the Albans.  Several of the Albans' customers were deported. One customer who relied upon the Albans' advice was arrested and jailed for almost 11 months.[12]  In 2007 and 2008, the Albans[13] settled two separate lawsuits brought by customers by signing findings of fact acknowledging ineffective assistance with immigration applications.[14]  Nevertheless, the Albans continued to operate their immigration business, as before, until June 1, 2011.

---

[12]  See Guevara Rivera Decl. 8 ¶ 29, Pl.'s Ex. 3.
[13]  And Loma.
[14]  See Pl.'s Ex. 23 - Miguel Zelaya, et.al. v. Manuel Alban, et. al., Civil Case No. 0101-0012695-2007; Pl.'s Ex. 24 - Santos Bacilia Guevara Rivers v. Manuel Alban, etc. al., Civil Case No. 0101-0004723-2008.

On June 1, 2011, the FTC filed the instant lawsuit, obtained an ex parte Temporary Restraining Order, appointment of a monitor, and permission to enter the Albans' business premises and seize records. The Albans' records were incomplete and poorly organized. Nevertheless, the monitor was able to identify and contact some of the estimated 1,000 immigration customers[15] to provide assistance with any outstanding immigration requirements. By virtue of the lack of reliable and adequate financial records, the monitor retained a forensic accountant to assist with a determination of the revenues received from the provision of immigration services.[16]

The Albans terminated their immigration service business as of June 1, 2011 and state that they do not intend ever again to provide any kind of immigration service.

C. Liability

To establish liability under section 5 of the FTC Act, the FTC must establish that the activities of the Defendants were "in or affecting commerce"[17] and that:

(1) there was a representation, omission, or practice;

_____

[15] The monitor estimated that the Albans had approximately 1000 customers between 2001 and 2011. Not all of these were currently open cases requiring assistance.
[16] See Monitor's Report, Pl's Ex. 105.3.
[17] There is no doubt that the activities at issue affected commerce.

(2)  that was likely to mislead customers acting reasonably
     under the circumstances; and

(3)  the representation, omission, or practice was
     material.

FTC v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003); FTC
v. Gill, 265 F.3d 944, 950 (9th Cir. 2001).

If these three elements are proven, the FTC need not prove
any intent to deceive, and were the Defendants able to prove
good faith,[18] it would not provide a defense.  FTC v. Patriot
Alcohol Testers, Inc., 798 F. Supp. 851, 855 (D. Mass. 1992);
FTC v. Verity Int'l, Ltd., 443 F.3d 48, 63 (2d Cir. 2006); FTC
v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th
Cir. 1988).

To hold an individual liable for the deceptive acts or
practices of a corporate entity, the FTC must establish that the
individual had some knowledge of the unlawful conduct, and the
individual participated in the acts or had authority to control
the conduct.  FTC v. Ross, 897 F. Supp. 2d 369, 384 (D. Md.
2012) (citing FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 573-
74 (7th Cir. 1989)).  The knowledge requirement may be fulfilled
by showing actual knowledge of material misrepresentations or
reckless indifference to the truth or falsity of such

---

[18]  The Albans have not, however, proven good faith. Indeed the
Court finds that Mr. Alban intentionally sought to mislead his
customers as to his competence and authority and Mrs. Alban was,
at best, a willfully blind enabler of Mr. Alban's deception.

misrepresentations.  Id.  "[T]he degree of participation in business affairs is probative of knowledge."  Id. at 385 (quoting Amy, 875 F.3d at 574).


    1.   Representations

The FTC must prove that a defendant made some representation, whether implied or express. Patriot, 798 F. Supp. at 855; see also FTC v. Figgie Int'l, Inc., 994 F.2d 595, 604 (9th Cir. 1993)(noting that the difference between implied and express representations is "a distinction without a difference").

The FTC has proven that the Albans and Defendant Loma represented themselves, both expressly and impliedly, as qualified immigration consultants legally authorized to provide the immigration services they rendered for customers.

The Albans contend that they made no express representation of being authorized to provide immigration services and that simply operating the business does not serve as an implied representation that they were authorized to do so.  However, lack of proper licensing is a material fact, which if not disclosed, deceives and is an unfair or deceptive trade practice. Golt v. Phillips, 517 A.2d 328, 332 (Md. 1986).  The provision of a service reasonably implied the legal

authorization to provide such a service, hence is sufficient to support the finding that there was a representation, omission, or practice.

The evidence includes many consumers' USCIS immigration forms that were prepared[19] and filed by the Albans and Loma. Both Mr. and Mrs. Alban signed as preparer in the preparer's block and Loma's name and business address appeared on the forms. Indeed, the Albans and Loma specifically acknowledged providing immigration services in documents filed to settle state court litigation against them.

The Albans used Loma letterhead with "IMMIGRATION AND CITIZENSHIP" printed clearly to stand out from other services listed at the top of the page under the company name. See, e.g., Pl's Ex. 5.13. The immigration services were marketed mainly by referrals and word of mouth but also by direct solicitation. See, e.g., Lovo Decl. 1 ¶ 3, Pl.'s Ex. 1 ("My friend then told me about Manuel Alban, whom she described as a good attorney who had prepared her TPS application. My friend gave me Mr. Alban's phone number. . . ."); Bernal Decl. 1 ¶ 2, Pl.'s Ex. 2 ("On several occasions . . . I talked to Mr. Alban, who encouraged me to visit him and get his help."); Guevera

---

[19] Starting in 2002 or 2003, the Albans and Loma used a software program to prepare and complete the forms on their office computer.

Rivera Decl. 1 ¶ 3, Pl.'s Ex. 3 ("[My sister] told me about an attorney named Manuel Alban who had prepared her immigration documents."); Vasquez Montoya Decl. 1 ¶ 2, Pl.'s Ex. 4 ("I heard of Mr. Alban through my brother . . . .").

Although the finding is not necessary to establish liability in the instant case, the Court finds that the Albans by implication (and sometimes expressly) at times[20] falsely represented Mr. Alban to be an attorney. See, e.g., Lovo Decl. 3 ¶ 9, Pl.'s Ex. 1 ("I believed Mr. Alban was an attorney . . . ."); Guevera Rivera Decl. 8 ¶ 29, Pl.'s Ex. 3 ("I would never have used Mr. Alban's services if I had known he was not an attorney."). One customer testified that Mr. Alban had specifically stated that he was an attorney. See, e.g., Montoya Decl. 4 ¶ 14, Pl.'s Ex. 5 ("When I asked Mr. Alban if he was an attorney, he said 'of course I am an attorney.'"). One check was found payable to Manuel Alban for "legal fees." Pl's Ex. 58. Moreover, there is evidence of occasions when Mr. Alban sought to provide legal services, including his writing a letter on behalf of a "client" threating legal action. And in recorded telephone conversations, Mrs. Alban was less than candid when

---

[20] In 2011, having been expressly warned by state authorities about practicing law without a license, the Albans had an erasable "whiteboard" on the office wall stating, in handwritten Spanish, "This is not a law office."

13

responding, "How can I help you?" to the question: "Is this attorney Manuel Alban's office?"  Pl.'s Ex. 6.2.  Nor did Mr. Alban choose to inform a telephone caller stating, "I am interested in getting attorney Manuel Alban's services" that he was not an attorney.  Pl.'s Ex. 6.4.

### 2.  Misleading

The Court must consider whether a representation is likely to mislead a reasonable consumer by viewing the representation as a whole and focusing on the impression created, not its literal truth or falsity. <u>Patriot</u>, 798 F. Supp. at 855.  "In evaluating a tendency or capacity to deceive, it is appropriate to look not at the most sophisticated, but the least sophisticated consumer."  <u>FTC v. Five-Star Auto Club, Inc.</u>, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000).

The FTC did not have to prove that each individual customer relied on the Defendants' misrepresentations or omissions; a representative sample of injured consumers is sufficient. <u>Figgie</u>, 994 F.2d at 605.  The FTC has provided adequate sampling evidence.  For example, Ms. Guevara Rivera, Ms. Lovo, Mr. Maddox, and Mr. Vasquez Montoya testified that they hired and paid Defendant Manuel Alban to help them with their immigration needs because Defendants represented that Mr. Alban was

qualified to provide immigration services. See, e.g., Pl.'s Exs. 1, 3, 4, 50.

Even without this sampling testimony, the Court finds that the Albans' and Loma's representations were likely to mislead a reasonable consumer of the services provided to believe that the Albans and Loma were competent, qualified, and legally authorized to provide such services.

The fact that some of the Albans' and Loma's customers were satisfied with the services they received does not provide a defense. Amy, 875 F.2d at 572. Indeed, there is no reason to doubt that these customers relied upon the Albans' representations of competence, qualification and legal authority. Fortunately, they were not among the customers who suffered for their reliance.

3. Materiality

A material representation is one that involves information that is important to consumers such that it is likely to affect their decisions or actions. Patriot, 798 F. Supp. at 855; FTC v. Cyberspace.Com LLC, 453 F.3d 1196, 1201 (9th Cir. 2006). Express representations that are shown to be false are presumptively material. Patriot, 798 F. Supp. at 855.

The FTC has proven that the representations that the Albans and Loma were competent, qualified and legally authorized to provide the services at issue "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding [the services]." Kraft, Inc. v. FTC, 970 F.2d 311, 322 (7th Cir. 1992).

Although such evidence is not necessary, the FTC provided testimony of some customers that the Defendants' representations were material to their deciding to use the Defendants' services. Mr. Maddox, Ms. Guevara Rivera, Mr. Vasquez Montoya, and Ms. Lovo each testified that had they known that Manuel Alban was not authorized to provide immigration services, they would neither have sought nor paid for the services. Pl's Exs. 1, 3, 4, 50.

The Court finds that the FTC has proven the materiality element of the FTC Act § 5 violation.


4.    Liability Conclusion

The Court finds that the FTC has proven each of the elements necessary to hold the Albans and Loma liable under § 5 of the FTC Act.

The Albans personally violated the statute by their own individual actions.  Loma, Inc., acting through the Albans, also

violated the statute, holding itself out as competent, qualified, and legally authorized to provide immigration services.

The Court finds that the FTC has not proven that Servicios is liable under FTC Act § 5. Unlike Loma, Servicios was never held out as providing immigration services and did no more than provide – without compensation - a checking account conduit for the transmission of customer funds to the USCIS.

C.    Remedy

Courts have broad authority to issue a permanent injunction and ancillary relief for the violation of any law enforced by the FTC. Amy, 875 F.3d at 571-72; FTC v. Ameridebt, Inc., 373 F. Supp. 2d 558, 562-63 (D. Md. 2005). Included in the power to grant ancillary relief is the authority to order payment for consumer redress. Amy, 875 F.3d at 571; see also Ameridebt, 373 F. Supp. at 562 ("The authority to grant such relief includes the power to grant any ancillary relief necessary to accomplish complete justice, including ordering equitable relief for consumer redress through the repayment of money, restitution, rescission, or disgorgement of unjust enrichment.").

### 1. Permanent Injunction

Permanent injunctive relief is appropriate when there is "some cognizable danger of recurring violation." Ross, 897 F. Supp. 2d at 387 (citing FTC v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008)(internal quotations omitted)). Some factors to consider include: (1) defendants' scienter; (2) whether the conduct was isolated or recurrent; (3) whether defendants are positioned to commit future violations; (4) degree of consumer harm; (5) defendants' recognition of culpability; and (6) sincerity of defendants' assurances against future violations. Id. The injunction must not unduly harm the defendants but simply ensure that they do not continue the violations. Id. However, "the egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature." Id.

The Defendants argue that an injunction is unnecessary because they ceased operating in June 2011 and do not intend to restart the immigration services business. However, the Court finds that injunctive relief is necessary to ensure that the Albans (and any entity that they control) do not, again, prey upon vulnerable consumers by purporting to offer services that they are not competent, qualified, and legally authorized to provide.

The Court finds that absent an injunction, there is a realistic danger that the Albans will find and take another opportunity to mislead consumers, particularly those who speak Spanish and not English, in violation of § 5 of the FTC Act.

The FTC seeks, and may well be entitled to obtain, broad injunctive relief. However, the Court finds a need to hear further evidence and argument regarding the terms of the injunction to be issued. In particular, the Court wishes to consider providing injunctive relief regarding violations of § 5 of the FTC Act in addition to those only related to immigration services.[21]

### 2. Restitution

Since the Court holds that a permanent injunction is warranted, restitution may be provided. To obtain restitution under Section 13(b) of the FTC Act, the FTC must prove consumer reliance.

Consumer reliance can be established by a representative sample of injured consumers or by a showing that "(1) the business entity made material misrepresentations likely to

---

[21] For example, income tax preparation services. Indeed, the evidence at trial indicates that, while providing income tax return preparing services to the public, Mr. Alban prepared and filed unreliable – if not outright fraudulent – income tax returns on behalf of himself and his corporations.

deceive consumers, (2) those misrepresentations were widely
disseminated, and (3) consumers purchased the entity's
products." Ross, 897 F. Supp. 2d at 387 (quoting FTC v. Freecom
Commc'ns, Inc., 401 F.3d 1192, 1206 (10th Cir. 2005)); Figgie,
994 F.2d at 605-06.

The Court finds that the FTC has met its burden to show
consumer reliance in both fashions.  There is evidence of a
representative sample of injured customers.  In addition, the
Albans and Loma made false representations that were likely to
deceive customers, were widely distributed in the context of the
specific community to which directed and, in reliance on these
false representations, consumers purchased the services at
issue.

Under Section 13(b), the Court has authority to provide for
disgorgement relating to the amount of the defendants' unjust
enrichment.  FTC v. Washington Data Res., Inc., 704 F.3d 1323,
1326 (11th Cir. 2013).  "[I]n many cases in which the FTC seeks
restitution, the defendant's gain will be equal to the
consumer's loss because the consumer buys goods or services
directly from the defendant."  Id. (quoting Verity, 443 F.3d at
68).  The correct measure of unjust gains under Section 13(b) is
the "net revenue (gross receipts minus refunds), rather than the
amount of profit (net revenue minus expenses)."  Id. at 1327.

The FTC has the initial burden to show the amount of assets subject to disgorgement.  FTC v. Washington Data Res., 856 F. Supp. 2d 1247, 1279 (M.D. Fla. 2012) aff'd sub nom. FTC v. Washington Data Res., Inc., 704 F.3d 1323 (11th Cir. 2013).  All that is required is "a reasonable approximation of a defendant's ill-gotten gains."  Id.  The burden then shifts to the defendants to show that the FTC's figures are inaccurate.  Id. at 1281.

The Defendants' incomplete and poorly organized files and lack of adequate and reliable financial records[22] made it impossible for the FTC to present definitive evidence establishing precisely their revenue derived from the services at issue.  The FTC presented the testimony of Mr. Joseph Dengler, a former Internal Revenue Service Agent experienced in the reconstruction of income from incomplete records.  Mr. Dengler used alternative methods[23] to estimate the Defendants' revenue received from the services at issue.  He testified that

---

[22]  The Defendants had no internal accounting program or method for recording the amount of money received from individual customers. Further, it appears that a substantial amount of the money received was in cash.  Although the Albans report that Loma had its own bank account that should have been used to analyze bank deposits made during the period, there were no records available for that bank account prior to 2008.
[23]  See Pl's Ex. 105.3.  Two different methodologies were used to estimate net revenues, each with two variables based on the bank account records found, the receipts that were found, a subset of 110 customer files from 2010, and information regarding fees charged as supplied by the Albans.

the Defendants' revenue attributed to the services at issue was within a range from $479,000[24] to $753,406.[25]

The Court finds Mr. Dengler's testimony to be reliable and adequate to provide a "reasonable approximation" of the relevant revenue and, therefore, shifts the burden to the Defendants to show that the estimated range is too high. Washington Data Res., 856 F. Supp. 2d at 1281.

Defendants contend that the estimated range is too high because the estimated fee per transaction was excessive, and some clients did not pay the total fee charged.[26]  Mr. Alban testified that they charged $25 per client in 2001, and they increased the fee to $50 in 2004 and then to $100 sometime

---

[24]  This figure is derived from estimation method #1, which is based on deriving an average number of transactions per client of 4.79 based on the detailed review of 110 client files, i.e., $100.00 constant fee per transaction x 4.79 transactions x 1000 clients = $479,000.00. Using this same method with an average fee per transaction of $129.67, calculated from evidence of fees charged over the years ranging from $80.00 to $200.00, results in an estimation of $621,119.30, i.e., $129.67 per transaction x 4.79 transactions x 1000 clients = $621,119.30.

[25]  This figure is derived from estimation method #2 – using the actual Servicios checks written to USCIS between April 2001 and July 2007 to derive a number of transactions per year, and extrapolating that average forward to 2011 after the Albans stopped using Servicios to write checks to USCIS, and using an average per transaction fee of $129.67 as in method #1.

[26]  Mr. Alban testified that some clients also did not pay the entire USCIS fee due and that Loma would advance the fee on an understanding that it would be repaid.  Not all clients repaid these advances.

around 2007.[27]  Additional fees were also charged, but they were

for other services such as translation or photographs and not

for filling out the immigration forms.  The Defendants estimate

– without support from any reliable documentation - that they

received from the services at issue only about $200,000 in

total.

The reasonableness of an approximation varies depending on

the information available, but "the risk of uncertainty should

fall on the wrongdoer . . . ."  Med. Billers Network, 543 F.

Supp. 2d at 324.  As stated by other courts:

> [W]here defendants' record keeping has "so
> obscured matters that lawful gains cannot be
> distinguished from the unlawful without
> incurring inordinate expense, it is well
> within the district court's power to rule
> that the measurement of disgorgement will be
> the more readily measurable amount of losses
> incurred by the defendants' customers in the
> unlawful transactions."

FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997)(quoting CFTC v.

Am. Metals Exchange Corp., 991 F.2d 71, 77 (3d Cir. 1993)).

The Court finds the Defendants testimony pertaining to

their finances unreliable.[28]  Thus, the Court finds that the

---

[27]  The Court notes that the monitor's report indicates that the
customer affidavits and the documentary evidence do not support
these lower numbers, but rather that the fee charged from 2001-
2006 was $100, from 2007-2009 was $150, and from 2010-2011 was
$200. Monitor's Report 6, Pl.'s Ex. 105.3.
[28]  Indeed, as established by the testimony at trial, the income
tax return records that were available would, if correct,

23

Defendants' receipts from the services at issue are within the range of $479,000 to $753,406. However, the amount of disgorgement to be ordered does not necessarily equate to the revenue derived from the services.

The Court, considering an equitable remedy, finds it appropriate to take into account the Defendants' current financial circumstances because disgorgement is designed to be remedial and not punitive. See Febre, 128 F.3d at 537. Moreover, it may be appropriate to consider the ultimate disposition[29] of any amount of disgorgement paid. Therefore, the Court finds a need to hear further evidence and argument regarding the amount of disgorgement to be required.

IV.  CONCLUSION

    For the foregoing reasons, as stated more fully herein:

    1.  The Court finds Defendant Manuel E. Alban, Lola P. Alban, and Loma International Business Group, Inc., but not Defendant Servicios LatinoAmericanos De Maryland, Inc., liable for violating Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with the advertising, marketing, and sale of United States immigration services.

---

establish that the Albans provided all of the services at issue without receiving any income at all.

[29]  For example, how – if at all – amounts paid would be utilized to "repair" the damage caused by the Defendants through refunds to customers or otherwise.

24

2.    The Court finds that a permanent injunction pursuant to § 13(b) of the FTC Act, 5 U.S.C. § 53(b), is appropriate.

3.    The Court finds that the injunctive relief should include a restitution requirement.

4.    The Court finds it necessary to conduct further proceedings related to the terms of the aforesaid permanent injunction and the amount of the aforesaid restitution requirement.

SO DECIDED on <u>Wednesday, June 5, 2013</u>.


                        _____/s/_____
                                   Marvin J. Garbis
                   United States District Judge